IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,911

In the Matter of MARTY K. CLARK, Magistrate Judge,
*Respondent*.

ORIGINAL PROCEEDING RELATING TO JUDICIAL CONDUCT

Original proceeding in discipline. Opinion filed January 28, 2022. Stipulations regarding violations of the Kansas Code of Judicial Conduct accepted and no further action taken.

*Todd N. Thompson,* Examiner, Commission on Judicial Conduct, of Thompson-Hall P.A., of Lawrence, argued the cause.

*Christopher M. Joseph,* of Joseph, Hollander & Craft LLC, of Topeka, argued the cause.

PER CURIAM: This is an uncontested proceeding against Marty K. Clark (respondent) relating to his judicial conduct. At all times relevant to the proceeding before the panel, respondent was a district magistrate judge of the 20th Judicial District, consisting of Barton, Ellsworth, Rice, Russell, and Stafford counties.

Panel B of the Commission on Judicial Conduct (Commission) held a hearing on April 8, 2021. The parties had stipulated to certain facts before the formal hearing. After taking the matter under advisement, the panel unanimously found respondent had engaged in conduct which violated Canon 1, Rule 1.2 (Promoting Confidence in the Judiciary) (2021 Kan. S. Ct. R. 485); and Canon 3, Rule 3.1(C) (Extrajudicial Activities in General) (2021 Kan. S. Ct. R. 498).

1

After the hearing and arguments, the panel made the following findings of fact, conclusions of law, and recommendations:

<u>"FINDINGS OF FACT</u>

"Pursuant to Supreme Court Rule 619(b), the Panel finds the stipulated facts as jointly agreed to by the parties are proven by clear and convincing evidence. We emphasize several facts as critical to the disposition of this case.

"1.    Respondent used the social media website known as Club Foreplay ('C4P') which he described as 'a dating website for couples.'

"2.    Respondent maintained an account on the C4P website on and off for a couple of years.

"3.    Respondent used the website to give access to other users to view nude and partially nude photos of himself, including a picture of Respondent standing in water with his penis visible.

"4.    Respondent sent sexually revealing photographs of himself to the complainant's wife.

"5.    Respondent requested that complainant's wife send sexually explicit photos to him.

"6.    The parties stipulated that the sexually revealing photographs were not available to be viewed by any C4P subscriber without permission from the Respondent. He also claims the photographs were not available to the general public. However, as with any social media posting, the photographs could be disseminated to the general public once they are released.

<u>"CONCLUSIONS OF LAW</u>

"The Kansas Code of Judicial Conduct establishes standards of ethical conduct for judges in their professional and personal lives. The Preamble and Scope of the Code pinpoint the guiding principles we will utilize in resolving this disciplinary action:

"'Judges should maintain the dignity of judicial office at all times, and *avoid both impropriety and the appearance of impropriety in their professional and personal lives*. They should aspire at all times to conduct that ensures the greatest possible public confidence in their independence, impartiality, *integrity*, and competence. [emphasis added]' PREAMBLE [2].

"'To implement fully the principles of this Code as articulated in the Canons, *judges should strive to exceed the standards of conduct established by the Rules*, holding themselves to the highest ethical standards and seeking to achieve those aspirational goals, thereby enhancing the dignity of the judicial office.' [emphasis added] SCOPE [4].

"Each disciplinary case, whether it be discipline of an attorney or a judge, is considered individually under the facts established in that case. 'Each case is evaluated individually in light of its particular facts and circumstances and in light of protecting the public.' *In Re Jones,* 252 Kan. 236, 239, 843 P.2d 709 (1992); See *In Re Robertson,* 280 Kan. 266, 270, 120 P.3d 790 (2005) (analogizing judicial discipline cases to those of attorney discipline). Additionally, we note the Supreme Court recently reaffirmed the Code's application to a judge's personal conduct. In an opinion released on Friday, February 26, 2021, the Kansas Supreme Court noted unambiguously that 'Canon 1, Rule 1.2 demands a judge to act at all times-meaning 24 hours a day, 7 days a week, 365 days a year—"in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." (2020 Kan. S. Ct. R. 447.)' *In re Cullins,* 312 Kan. 798, 481 P.3d 774 (2021).

3

"Actions that bring into question a judge's integrity and would appear to a reasonable person to undermine that integrity, along with demeaning the judicial office, are at the heart of our decision today.

"1. RULE 1.2

"Promoting Confidence in the Judiciary

"'A judge shall act at all times in a manner that promotes public confidence in the *independence, integrity,* and *impartiality* of the judiciary, and shall avoid *impropriety* and the appearance of impropriety.'

"COMMENT

"[1] Public confidence in the judiciary is eroded by improper conduct and conduct that creates the appearance of impropriety. This principle applies to both the professional and personal conduct of a judge.

. . . .

"[5] Actual improprieties include violations of law, court rules, or provisions of this Code. The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge.

"2. RULE 3.1

"Extrajudicial Activities in General

"A judge may engage in extrajudicial activities, except as prohibited by *law* or this Code. However, when engaging in extra judicial activities, a judge shall not:

4

. . . .

"(C) participate in activities that would appear to a reasonable person to undermine the judge's *independence, integrity,* or *impartiality;* or demean the judicial office;

"The Kansas Judicial Code provides specific definitions for terms used in Rules 1.2 and 3.1. We highlight two of those definitions.

'Impropriety' includes conduct that violates the law, court rules, or provisions of this Code, and conduct that undermines a judge's independence, integrity, or impartiality. See Canon 1 and Rule 1.2.

'Integrity' means probity, fairness, honesty, uprightness, and soundness of character. See Canon 1 and Rule 1.2.

"The Kansas Judicial Code contemplates many kinds of conduct that reflect adversely on a judge's independence, integrity, or impartiality. See *In re Groneman.* 272 Kan. 1345, 38 P.3d 735 (2002) (public censure was appropriate for a judge who knowingly allowed his administrative assistant to be paid for work she had not performed); *In re Handy,* 254 Kan. 581, 867 P.2d 341 (1994) (public censure was appropriate sanction for a judge who bought a condominium that was the subject of a case over which he presided, purchased property that was the subject of litigation before him and then dismissed the foreclosure action against the property, and threatened a person pursuing litigation against him by sending the person information regarding the assessment of costs in lawsuits); *In re Alvord,* 252 Kan. 705, 706-07, 847 P.2d 1310 (1993) (public censure was the appropriate sanction for a judge who made inappropriate sexual advances toward a young female clerk and had also attempted to use his status as a judge to obtain dismissal of a traffic ticket the clerk had received); *In Re Yandell,* 244 Kan. 709, 772 P.2d 807 (1989) (removal from office was appropriate sanction for misconduct including leaving the scene of a noninjury accident, financial misconduct, and refusal to recuse from hearing cases involving financial institutions that held notes on which judge defaulted); *In re Woodworth,* 237 Kan. 884, 703 P.2d 844 (1985) (public censure was appropriate sanction for judge who was criminally convicted of violating

5

K.S.A. 41-407, possession of liquor without the Kansas tax stamps); *In re Miller,* 223 Kan. 130, 572 P.2d 896 (1977) (public censure was appropriate for a judge who attempted to use his position to dismiss or reduce the fine of a friend's traffic ticket).

"The Respondent cautions the Commission to steer clear of stepping on the slippery slope of regulating a judge's moral conduct. Respondent has articulated that when the Canons are interpreted to prohibit conduct in a judge's private sex life that has no effect upon his conduct in judicial office and is not prohibited by law, then the enforcement authority—be it an inquiry review board, a hearing panel for formal judicial complaints, or a court-enters 'the realm in which private moral beliefs are enforced and private notions of acceptable social conduct are treated as law.' *In the Matter of Dalessandro,* 483 Pa. 431, 457, 397 A.2d 743 (1979) (a married judge maintaining an intimate relationship with a married woman does not warrant censure, even if such is open and notorious, since such conduct is not prohibited by law.); But see *In Re Matter of Discipline of Turco,* 137 Wash.2d 227, 970 P.2d 731 (1999) ('We reject the implication in the *Matter of Dalessandro,* 483 Pa. 431, 397 A.2D 743 (1979), that matters in one's personal life which legitimately reflect upon the jurist's professional integrity are immune from censure').

"Respondent maintains that matters of personal morality that do not affect a judge's integrity or ability to judge impartially are best left to the ballot box. See *Dalessandro,* 483 Pa. 431, 460 ('Standards in these private areas are constantly evolving and escape, at any given moment, precise definition. Conduct of a judge or any public official which may be offensive to the personal sensitivities of a segment of the society is properly judged in the privacy of the ballot box.') The respondent judge in *In Re Robertson,* 280 Kan. 266, 120 P.3d 790 (2005) raised a similar 'ballot box argument', but it was rejected by the Supreme Court under the constitutional duty to discipline a judge:

'In arguing that his conduct does not justify the sanction of removal which was recommended by the Commission, the Respondent argues that courts should be cautious in removing judges because doing so disrupts the public's choice of who should serve in the judiciary. He argues that public choice is expressed in retention elections which follow a judge's appointment to office (which is Respondent's situation), just as it is

6

expressed in contested judicial elections. We agree. However, the public has also expressed its choice to have a system of discipline which can result in a judge's removal from office. This choice is expressed in Article 3, § 15 of the Kansas Constitution which provides that a judge "shall be subject to retirement for incapacity, and to discipline, suspension and removal for cause by the supreme court after appropriate hearing." See *In re Yandell,* 244 Kan. 709, 717, 772 P.2d 807 (1989) (retention vote after misconduct occurred may be a mitigating factor, but "such retention certainly does not preclude this court from imposing discipline for respondent's conduct during his prior term").' 280 Kan. at 270-271.

"The Kansas Judicial Code's repeated use of the term 'integrity' accentuates the Commission's duty to enforce moral conduct that does not promote public confidence in the judiciary. A judge must act at all times in his or her professional and personal life in a way that promotes public confidence in the integrity of the judiciary. Similarly, a judge must veer away from conduct that suggests the appearance of impropriety as undermining a judge's integrity. The Commission discussed at great length the term integrity and its expressed definition in the Kansas Judicial Code as including the quality of uprightness. Nearly all of the definitions of 'uprightness' describe a person who is 'honorable.' We are unanimously convinced the Respondent's actions in this case cannot be described as 'honorable.' Other cases have come to this conclusion as well.

"In the Pennsylvania case of *In re Singletary,* the Pennsylvania Court of Judicial Discipline found that a judge brought the 'judicial office into disrepute' when he showed a traffic court cashier two photographs of his erect penis on his cell phone. The judge contended he only displayed the photos for a few seconds and that he 'did not realize that he would be showing them' to the cashier-that the photos were an unplanned part of the otherwise proper presentation. 61 A.3d 402, 405-06 (Pa. Ct. Jud. Disc. 2012). The court acknowledged the judge's claim of inadvertence, but found that under even the 'lowest scores on the sensitivity index' the public would not expect a judge to be photographing his penis and then setting forth a chain of events that resulted in the display of the pictures to the cashier. In ultimately removing the judge from office, the court stated:

'We will not permit a claimed capricious memory to rescue Respondent from responsibility for the distressful culmination of a chain of events which he intentionally set in motion. We hold that a judge who intentionally grooms his penis for photography, and then intentionally photographs his penis for the purpose of display to others, had better remember that the photographs are in his phone lest they "slip out" at some inopportune (albeit unplanned) time under circumstances which are likely to offend another person or persons, for, if they do, we will hold such conduct satisfies the "*mens rea* requirement" so as to support a finding that the conduct is such that brings the judicial office into disrepute.' 61 A.3d at 412.

"Similar to the chain of events scenario in *Singletary,* we do not agree with the parties' stipulation that the photographs Respondent posted on the C4P website were not available to the general public. The Respondent cannot hide behind a claim that these were not public because he was the only person who could give permission for a C4P user to view them. Respondent gave the complainant and his wife access to the photos. When Respondent opened the door by releasing the photos to even one person on this social media website, those photos could be generally disseminated to the social media world and even finding their way to the Commission on Judicial Conduct.

"In Alabama, a judge consented to a recommended suspension for 180 days without pay for beginning a racy Facebook relationship with a woman. See *In the Matter of Archer,* 2016 WL 7106106 at *1 (Al. Jud. Inq. Comm. 2016). The judge in *Archer* communicated during working hours with a former litigant in his court in an explicitly sexual manner via social media by exchanging sexually explicit material, including photographs of genitalia, breasts and buttocks and by propositioning the woman for sexual encounters. Under the Alabama Canons of Judicial Ethics, the complaint alleged the judge's conduct demonstrated:

'[A] failure to uphold the high standards of conduct required of judges so that the integrity and independence of the judiciary may be preserved, a failure to avoid impropriety and the appearance of impropriety in all his

8

activities, a failure to at all times maintain the decorum and temperance befitting his office, and a failure to avoid conduct prejudicial to the administration of justice that brings the judicial office into disrepute.' 2016 WL 7106106, at *1.

"The Kansas Supreme Court in *In re Robertson,* 280 Kan. 266, 120 P.3d 790 (2005), removed a judge from office where he violated a judicial district administrative order by frequently using his county-owned computer located at work over a 9-month period to access and display sexually explicit images, messages, and materials. The Court held:

'Finally, and under the circumstances of this case, the most serious aggravating factor is the effect the misconduct had upon the integrity of and respect for the judiciary. The Preamble to the Kansas Code of Judicial Conduct reminds judges they 'must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system.' Rule 601A (2004 Kan. Ct. R. Annot. 535). Because public trust is essential to an effective judicial system and one judge's conduct may have a significant impact upon the public's perception of the entire judicial system, '(a) judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on the judge's conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.' Canon 2, Commentary (2004 Kan. Ct. R. Annot. 540).' 280 Kan. at 272-73.

"Despite Respondent's warning about drawing a bright line on a judge's moral conduct, the Kansas Judicial Code imposes a duty that encompasses a judge's moral conduct when those actions question the very nature of integrity and demean the judicial office. The Respondent's decision to take a picture of his penis and post that picture on a social media website crossed that bright line and violated the Judicial Canons requiring a judge to act with integrity and would appear to a reasonable person to undermine the

9

judge's integrity and demean the judicial office. The Respondent has violated Rules 1.2 and 3.1(c).

"The *Robertson* court discussed helpful factors to use in evaluating the appropriate judicial discipline to impose, to-wit: 'the extent of the misconduct, the nature of the misconduct, the judge's conduct in response to the Commission's inquiry and disciplinary proceedings, the judge's discipline record and reputation, and the effect the misconduct had upon the integrity and respect for the judiciary.' *Robertson,* 280 Kan. at 270, 120 P.3d 790 (citing Gray, Handbook for Members of Judicial Conduct Commissions 15 [American Judicature Society 1999]). These factors are now codified in Rule 619(e):

'Factors Considered for Disposition. In making a disposition, a Hearing Panel may consider the following:

'(1)    the extent of the misconduct;

'(2)    the nature of the misconduct;

'(3)    the respondent's conduct in response to the Commission's proceedings;

'(4)    the respondent's discipline record and reputation;

'(5)    the effect the misconduct had on the integrity of and respect for the judiciary; and

'"(6)    any other relevant factors.'

"We find the aggravated factors of the nature of the Respondent's conduct and the effect that it had on the integrity and respect for the judiciary to overwhelm every other factor in this case. Paragraph #4 of the January 12, 2021, joint stipulation of facts states that Respondent had not previously been disciplined by the Commission. This stipulation is not an accurate depiction of Respondent's judicial discipline history. Respondent has not received any discipline which would be published under Supreme Court Rule 622. All other complaints, investigations, reports, correspondence, proceedings, and Commission records are private and confidential under Supreme Court Rule 611.

"A judge's discipline is not the ultimate purpose of regulating the Kansas judiciary. However, discipline is the collateral consequence of enforcement of the Kansas Code of Judicial Conduct. The aim of judicial discipline 'is the maintenance of the honor and dignity of the judiciary and the proper administration of justice rather than the punishment of the individual.' *State ex rel. Comm'n on Judicial Qualifications v. Rome,* 229 Kan. 195, 206, 623 P.2d 1307 (1981).

"Judges should be the role models of our society. A judge's integrity, while never spotless, should exhibit behavior that is or should be emulated by others. The Kansas Judicial Code requires this Commission to judge the impropriety, or the appearance of impropriety, of a judge's actions in his or her professional and personal lives. Although this task is not simple, we know when a judge's actions have crossed over the line of what the Respondent has described as the moral compass of our society and when a judge should be disciplined.

"We reiterate how the Scope of the Kansas Judicial Code sets forth how the rules establish a minimum level of ethical conduct and that judges should 'strive to exceed the standards of conduct established by the Rules.' Elevation to the bench carries the burden of 'striving to exceed' the standards of conduct established by the rules. SCOPE [4]. Judges are human. But the unique role of judges in our society forces a judge to understand that donning the black robe places a higher standard upon them than the average person. That higher standard imposes a duty to maintain the dignity of the judicial office and to aspire to ensure the greatest public confidence in their integrity as they uphold the laws and make sure justice is meted out fairly. This is where Respondent has failed.

## "RECOMMENDED DISPOSITION

"Pursuant to Supreme Court Rule 619(b)(3), (d) (2021 Kan. S. Ct. R. 535), based on the foregoing Findings of Fact and Conclusions of Law, and based on a unanimous vote of all seven members participating in the Formal Hearing, the Panel recommends to the Supreme Court of the State of Kansas that Respondent be disciplined for the violations by public censure."

11

Although Clark has retired, we have disciplinary jurisdiction over this matter. See *In re Henderson*, 306 Kan. 62, 72, 392 P.3d 56 (2017) (holding that this court has jurisdiction over "conduct that the respondent engaged in while he was serving as a district court judge" in order "to maintain the honor and dignity of the judiciary and the proper administration of justice rather than to punish the individual"). A formal complaint against a judge for violations of the Code must specify the charges against the judge and the alleged facts that are the basis for the charges. Supreme Court Rule 615(c) (2021 Kan. S. Ct. R. 531). If no exceptions are filed by a respondent judge to the hearing panel's Findings of Fact and Conclusions of Law, those Findings and Conclusions are conclusive and cannot be challenged by the respondent. Rule 620(d) (2021 S. Ct. R. 536) (formerly Rule 623). See *In re Pilshaw*, 286 Kan. 574, 579, 186 P.3d 708 (2008); *In re Robertson*, 280 Kan. 266, 269, 120 P.3d 790 (2005).

The respondent did not file any exceptions. In fact, the statement that he filed after the hearing panel made its recommendations reads, "[P]ursuant to Kansas Supreme Court Rule 620(c)(2)(A), Marty K. Clark states that the [*sic*] he will not file exceptions to the panel's findings, conclusions, or recommendations."

Ultimately, the question whether a respondent violated a rule is a question for this court and subject to de novo review. The non-filing of exceptions does not bind this court. However, in these unique circumstances concerning a complaint against a retired lay magistrate judge and where neither party has filed exceptions and each has affirmatively accepted the hearing panel's conclusions and resolution, we accept the respondent's stipulations and take no additional action. While we appreciate the concurring opinion's point of view, it reflects a position that no one in the proceeding has

taken or argued before us. An inquiry panel concluded there were rule violations, a hearing panel unanimously concluded there were two rule violations, and even the respondent has accepted the determination that there were violations of Canon 1, Rule 1.2 and Canon 3, 3.1(C), and the panel's recommendation of public censure. Because everyone involved in this case has come to the same conclusion, we see no need to further question their resolution.

IT IS ORDERED that this opinion shall be published in the official Kansas Reports.

\* \* \*

STEGALL, J., concurring:  I concur in the result reached by the majority to take no further action in this matter. But in my judgment, while Judge Marty K. Clark's behavior was embarrassing, foolish, and grossly immoral, it was not a violation of any of our rules governing judicial conduct. Because—let us be clear—the behavior we are talking about consists entirely of the lawful, private, consensual sexual practices of Judge Clark. Behavior that was only discovered by the Examiner and the Commission because it was disclosed by a disgruntled participant in that behavior.

To be sure, there was a time in our society when private, consensual sexual practices were not deemed off-limits to government regulation. For good or ill (or good and ill), that time has passed. Through a slew of judicial decisions, society has by now clearly decided that sexual conduct between consenting adults is none of the government's business. See, e.g., *Obergefell v. Hodges*, 576 U.S. 644, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015) (requiring all states to grant same-sex marriages and recognize same-sex marriages granted in other states); *Lawrence v. Texas*, 539 U.S. 558, 560, 562, 578, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) (overruling *Bowers v. Hardwick*, 478

13

U.S. 186, 106 S. Ct. 2841, 92 L. Ed. 2d 140 [1986], by striking down a Texas anti-sodomy law and holding that states may not make private consensual conduct a crime, noting that individuals have an "autonomy of self that includes freedom of . . . certain intimate conduct"); *Stanley v. Georgia*, 394 U.S. 557, 568, 89 S. Ct. 1243, 22 L. Ed. 2d 542 (1969) (acknowledging states' "broad power to regulate obscenity" but determining that such "power simply does not extend to mere possession [of obscene material] by the individual in the privacy of his own home"); *Loving v. Virginia*, 388 U.S. 1, 12, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967) (declaring all bans on inter-racial marriage unconstitutional); *Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965) ("Various guarantees create zones of privacy.").

Indeed, the scope of private behavior protected from government regulation must be broader than simply sexual conduct. See generally U.S. Const. amend. I, II, IV (shielding a variety of private practices and places from overweening government intrusion). Kansas and Kansans, too, have long valued personal privacy, being one of the first states to recognize a common-law right of privacy and action in tort from the public and employers. See *Dotson v. McLaughlin*, 216 Kan. 201, 207-08, 531 P.2d 1 (1975); *Kunz v. Allen*, 102 Kan. 883, 885, 172 P. 532 (1918).

Rapid advancements and use of technology, however, have outpaced legal protections for privacy. Surveillance of all kinds (including the kind of self-surveillance practiced by Judge Clark) abetted by ubiquitous high-powered video and audio recording devices—along with the ease of publication and distribution offered by digital social media—has allowed for substantial increase in governmental and employer intrusion into the private lives of individuals.

We have become a society not so much subject to one all-powerful watcher but to the whims of a thousand-and-one watchers. See Orwell, 1984 2 (A Plume Book, 60th

14

anniv. ed., 1983) (1949) ("You had to live—did live, from habit that became instinct—in the assumption that every sound you made was overheard, and, except in darkness, every moment scrutinized."). Indeed, "it isn't some stern and monolithic Big Brother that we have to reckon with as we go about our daily lives, it's a vast cohort of prankish Little Brothers equipped with devices that Orwell, writing 60 years ago, never dreamed of and who are loyal to no organized authority." Kirn, *Little Brother Is Watching*, The N.Y. Times Magazine, Oct. 17, 2010, at 17. By turning "our lenses on ourselves in the quest for attention by any means" the "invasion of privacy . . . has been democratized." Kirn, at 17. A truth Judge Clark now knows in full.

The norming of 24/7 surveillance can lead to acceptance of the fact as not just a nuisance but as a positive good. See Turkle, Alone Together: Why We Expect More from Technology and Less from Each Other 247-48 (2011) (showing that one effect of the 9/11 attacks and high-profile school shootings was a societal tradeoff of privacy for security; these tragedies generated a culture of national "anxiety" and promoted a perceived need for "continual contact" and connectivity); Mendelson, *How the Fallout from Post-9/11 Surveillance Programs Can Inform Privacy Protections for Covid-19 Contact Tracing Programs*, 24 CUNY L. Rev. 35, 36-37 (2021) ("During the response to the COVID-19 pandemic, there has been a key shift in the 'expected' surveilled population from the post-9/11 era. Rather than surveillance policy that is outwardly aimed at allegedly *suspect* populations, . . . it can now include all U.S. citizens at home or abroad, non-citizens in the country, and others trying to enter the country."); Li, *Privacy in Pandemic: Law, Technology, and Public Health in the Covid-19 Crisis*, 52 Loy. U. Chi. L.J. 767, 777 (2021) ("Robots have also been deployed as part of government COVID-19 response, including for monitoring, crowd dispersal, enforcing social distancing, identifying infected people, and giving public information."); Keller, *Balancing Employer Business Interests and Employee Privacy Interests: A Survey of Kansas Intrusion on Seclusion Cases in the Employment Context*, 61 U. Kan. L. Rev.

983, 983 (2013) ("Employers test employees for AIDS and drug use; videotape them; electronically monitor their computer use, Internet use, emails, text messages, and phone calls; and track their movements with Global Positioning System [GPS] technology.").

And as many have observed, we are now well into the end game of surveillance which may be described as a kind of collusion between big and little brothers. Governments have been unable to resist utilizing the vast store of data being collected by little brother to monitor the citizenry. "'[L]ots of surveillance data moves back and forth between government and corporations. One consequence of this is that it's hard to get effective laws passed to curb corporate surveillance—governments don't really want to limit their own access to data by crippling the corporate hand that feeds them.'" Torbert, *"Because It Is Wrong": An Essay on the Immorality and Illegality of the Online Service Contracts of Google and Facebook*, 12 Case W. Reserve J.L. Tech. & Internet i, 108 (2021) (quoting Schneier, Data and Goliath 80 [2015]); see also Constitutional Rights Foundation, *Edward Snowden, The NSA, and Mass Surveillance*, 10, 11 https://www.crf-usa.org/images/pdf/gates/snowden_nsa.pdf (describing the data collection practices exposed by Edward Snowden including the NSA program to collect phone metadata in "bulk" on virtually all Americans as well as the PRISM program which collected the substantiative content of emails, photos, and other media from Internet service provider companies such as Microsoft, Google, Apple, Yahoo, AOL, Facebook, YouTube, Skype, and Paltalk); Turkle, at 339-41 (discussing invasive government and private data collection programs such as LifeLog and the protested and troubled evolution of Facebook's terms of service including its use of the Beacon Marketing tool).

I am reminded of the truth that the "greatest dangers to liberty" are often found "in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States*, 277 U.S. 438, 479, 48 S. Ct. 564, 72 L. Ed. 944 (1928) (Brandeis, J., dissenting). And so reminded, wisdom councils that big brother himself is

16

not obliged to act on every scrap of tittle-tattle that comes his way from ill-meaning little brothers. This is the curious situation we now find ourselves in.

If the information about Judge Clark generated by this self-surveilling system genuinely showed sexual conduct that interfered with the ethical performance of his judicial duties, the Examiner, the Commission, and this court would have a duty to act on it. See, e.g., *In re Gerard*, 631 N.W.2d 271, 279 (Iowa 2001) (judge had a relationship with an attorney who appeared before him daily); *In re Miller*, 949 So. 2d 379, 394 (La. 2007) (judge had sexual relationship with his secretary several times in the courthouse); *Harris v. Smartt*, 311 Mont. 507, 512-13, 57 P.3d 58 (2002) (judge had pornographic images stored on his work computer).

But Judge Clark's actions did not have any real, factual connection to his role as a judge. So what is really going on? In short, Judge Clark has embarrassed us—the Examiner, the Commission, this court, the judiciary, and the wider legal community. And this may be the unforgivable sin of our day. The complex and ubiquitous shaming and shunning rituals our society has concocted and enacted in recent decades may best be understood as an elaborate response to collective embarrassment. Scapegoating and "cancelling" the most embarrassing among us becomes a quasi-religious way of purging collective shame and guilt. See Gallardo, *Taming the Internet Pitchfork Mob: Online Public Shaming, the Viral Media Age, and the Communications Decency Act*, 19 Vand. J. Ent. & Tech. L. 721, 727-28 (2017) (suggesting "the upswing in online . . . 'outrage culture'" allows individuals to demonstrate their disapproval of "socially offensive behavior" and thus "easily signal to others that they are trustworthy because they punished a norm violator"); Steele, *A Seal Pressed in the Hot Wax of Vengeance: A Girardian Understanding of Expressive Punishment*, 16 J. L. & Religion 35, 50, 60 (2001) (citing Girard, The Scapegoat 15 [Yvonne Freccaro trans., Johns Hopkins U. Press (1986)]) (describing how mob action restores peace in a community by "attribut[ing]

17

fantastical powers to what is actually a small and persecuted minority," which "the mob must believe . . . caused the crisis," noting that some of Girard's "most dramatic examples" of such scapegoating are "mob behavior in panics, riots, witch-hunts, and lynchings"); Colborne, *The Reasonable Citizen/The Unreasonable Scapegoat*, 3 J. Religion & Violence 73, 73, 83-84 (2015) ("[T]he modern liberal state has not escaped the organized violence of the scapegoat mechanism as described by Girard [who theorized that] the act of exclusion is what creates the agreement that forms the basis of a stable society. . . . The scapegoat mechanism is the ritual outlet that pours all of the pent up violence on a victim and restores the social unanimity riven by rivalry.").

The Examiner and panel in this case have acted as grand inquisitors on behalf of an allegedly scandalized public. The Examiner's filings below passionately decry Judge Clark's behavior—quoting *In re Singletary*, 61 A.3d 402, 412 (Pa. Ct. Jud. Disc. 2012), for the claim that the public does not want its "judges to be conducting photo sessions featuring the judicial penis and then to be sending the photos over the electronic airwaves to another person—thereby placing that person in a position to further publish the photos to anyone he or she may deem deserving." At oral argument, the Examiner likewise denounced Judge Clark's behavior. Judge Clark was described as "grooming his private organs for purposes of taking a photograph . . . not for him to look at himself" but to "give to other people." Which "in my opinion," the Examiner continued, "does nothing to enhance the integrity of the judiciary."

The Examiner, in filings and at oral argument, insisted on using the disparaging term "swingers" (as used on the website at issue) to describe Judge Clark and the others involved here. This, despite Judge Clark's preferred description of the website as a "dating site for couples" (and as opposed to the more clinical and objective term "consensual non-monogamy" as delineated by the American Psychological Association). See, e.g., Memorandum of Arguments and Authorities (Judge Clark was a "member of a

18

swingers' website"; he "joined an online swingers' club"; he promoted himself as a "swinger interested in extramarital sex"; and he was part of "an online swingers' community.").

In so doing, the Examiner evoked a misogynistic world of "wife swapping" and satirical portrayals of "international men of mystery." See Bergstrand & Blevins Williams, *Today's Alternative Marriage Styles: The Case of Swingers*, 3 Elec. J. of Hum. Sexuality (October 10, 2000) ("The origins of formalized swinging in the U.S. are not specifically known. In the 1950's the media reported a new phenomenon which it dubbed 'wife swapping.' California military couples reportedly gathered at 'key clubs' where husbands tossed their keys into a large pile in the center of a room. The wives then drew a set of keys at random and the owner of the keys became the sexual partner of that woman for the night."); see also Kane, *What to Know About Swinging Before You Try It Yourself*, Men's Health (May 29, 2020) https://www.menshealth.com/sex-women/a32677023/what-is-a-swinger/ ("When you think of the word 'swinger,' you might hear Mike Myers saying the word in his iconic Austin Powers voice. [*'Swinger, baby, yeah!'*])" All despite the fact that many participants in the "swinger lifestyle" (including Judge Clark) reject the "swinger" label because of the negative, sexist connotations it carries. See, e.g., Griebling, *The Casualization of Intimacy: Consensual Non-Monogamy and the New Sexual Ethos* 80 (2012) (Ph.D. dissertation, University of Pennsylvania) (ScholarlyCommons).

So who has really been scandalized? As with the excessive rhetoric, the legal justifications given by the Examiner and panel in this case are thin cover for the naked embarrassment—and the accompanying need to close ranks and restore a facade of judicial superiority—felt by all.

For example, the panel insists that the aim of the Code and of discipline under the Code is to ensure that judges remain "the role models of our society" who "exhibit behavior" in their "personal lives" that ought to be "emulated by others." This "unique role of judges" requires every judge to understand that "the black robe places a higher standard upon them" to uphold the "moral compass of our society" or face discipline for failing to do so. What is this undefined higher standard? Is the panel suggesting that judges have an obligation to have only traditional sexual relationships? Do we really desire a morally stratified society in which judges occupy the supposed highest and best strata while mortals live according to a "lower" standard? Is this what the Code demands?

The panel's understanding of the "role of judges in our society" partakes of a certain kind of judicial rhetoric afoot today—the rhetoric of judicial supremacy. There is a real effort by some to situate the figure of the judge as an idealized kind of ruler; set apart and consecrated to a holy and inscrutable order of something called "law"; worthy to be obeyed, in significant part, because of his or her moral and intellectual superiority. But in a society dedicated to the rule of law, judges are not a priestly class of elite rulers. Judges are not even supposed to be the role models of society. To think this is to take the myth of judicial supremacy to its most absurd conclusion. See Fallon, *Judicial Supremacy, Departmentalism, and the Rule of Law in a Populist Age*, 96 Texas L. Rev. 487, 488 (2018) ("The idea that the Supreme Court has ultimate authority in matters of constitutional interpretation—which often rides under the heading of 'judicial supremacy'—has acquired strong currency. A related view holds that the much celebrated ideal of the rule of law requires judicial supremacy. Perhaps not surprisingly, the [United States Supreme] Court has promoted judicial supremacy and associated it with the rule of law."); Amar, *Foreword: The Document and the Doctrine*, 114 Harv. L. Rev. 26, 82-83 (2003) ("The Rehnquist Court has also been fond of sweeping assertions of judicial supremacy, regularly proclaiming itself the Constitution's 'ultimate' interpreter, a self-description that nowhere appears in *Marbury* and never appeared in the United States

Reports until the second half of the twentieth century."); Pozen, *Judicial Elections as Popular Constitutionalism*, 110 Columbia L. Rev. 2047, 2057 (2010) (surveying the argument that judicial supremacy "has been a peculiarly debilitating force in American public life. Its harms include citizen passivity, elite rule, constitutional alienation, and judicial overreach.").

Today's case illustrates that one consequence of elevating judges to the "supreme" arbiters of society is that we will endure bizarre replays of age-old religious controversies concerning the qualifications of priests to administer religious rites. See Cardman, *The Praxis of Ecclesiology: Learning from the Donatist Controversy*, 54 Proceedings of the Catholic Theological Soc'y of Am. 25, 26-27 (2013) (detailing the history of the Donatist sect which looked to the "moral worthiness of the minister of a sacramental action," explaining that some bishops became "unworthy to minister" sacraments once they were determined to have "tainted" themselves).

Or consider another, more mundane example—the panel's finding that Judge Clark's picture project was "public" simply because those pictures could one day be made public. This definition of "public" cannot withstand the application of either common sense or the law. See K.S.A. 2020 Supp. 21-6101(f) (defining a "'private place'" as where one may reasonably expect to be safe from uninvited intrusion or surveillance). In fact, what happened here looks a lot like what our Legislature has recently outlawed as "revenge porn" or "nonconsensual pornography." See K.S.A. 2020 Supp. 21-6101(a)(8) (prohibiting dissemination of "any videotape, photograph, film or image of another identifiable person 18 years of age or older who is nude or engaged in sexual activity and under circumstances in which such identifiable person had a reasonable expectation of privacy, with the intent to harass, threaten or intimidate such identifiable person, and such identifiable person did not consent to such dissemination"). It appears to me that the Examiner and the Commission have unwittingly made themselves accomplices in one

man's effort to exact revenge against Judge Clark by "disseminating" his nude photographs and images of his sexual activities in which he had an expectation of privacy. See K.S.A. 2020 Supp. 21-6101(a)(8).

Would the Examiner and panel ever have used such disparaging and salacious terms along with such intimate and detailed descriptions to characterize the lives and practices of other, more socially accepted, sexual minorities? Would the Examiner file a case on such questionable legal grounds, for example, based solely on intimate photographs of a Kansas judge handed over by a spurned homosexual lover? What about photographs of consensual but unconventional sexual practices engaged in by a heterosexual married couple given to the Examiner by one of the spouses after a nasty divorce? Or is this simply the age-old game of the powerful scapegoating people who have no real constituency or friends in high places?

I may be an unexpected defender of "consensually non-monogamous" judges—and I have no difficulty condemning adultery as morally destructive—but above all else, the rule of law condemns the arbitrary and unaccountable power of the state to pick winners and losers, reward friends and punish enemies, and protect its own interests above the public's. Such abuses and the hypocrisy they reveal are the real threat to the legitimacy and integrity of the judiciary. The rule of law is not so weak it will collapse in the face of a few bedroom peccadillos or the occasional clownish, embarrassing episodes of official misadventure. But it is not so strong it can long endure the misrule of arbitrary double standards—which amount to a special kind of breach of the social contract.

An objection may be quickly raised that the moral content and quality of the personal character and integrity of our public officials matter. And more, that if a person becomes a public official like a judge, that person has agreed to make his or her private life a matter of public interest. There is real truth to this. But it is a grave mistake to think

that either the Commission, the Examiner, or this court represent the mores of the public—mores which, as every honest political observer would admit, prove to be inscrutable at times. Indeed, even if such mores were knowable, by what right would we claim the authority to enforce the moral qualms of the public of its behalf?

None of this means that within our system of government public officials are immune from either criticism or sanction for their private behavior and personal character. They are not. Judges are not. There are two clear and available political means for the public to express its own moral qualms about a public official's private behavior and character—sexual or otherwise. At the ballot box and in an impeachment proceeding.

Judge Clark could easily and correctly have been unseated by his constituents had they determined that his character was not of the kind they desired for their judges. I agree with the Supreme Court of Pennsylvania when it wrote:

> "Canon 1 refers to the 'high standards of conduct so that *the integrity and independence of the judiciary* may be preserved.' (Emphasis added.) Canon 2 like Canon 1 focuses upon 'public confidence in *the integrity and impartiality of the judiciary*.' (Emphasis added.) The language of these Canons strongly indicates that they are concerned with the conduct of a judge in his official capacity and not with his conduct in his private life.
>
> "It can be seen, therefore, that the constitutional scheme and the Canons are concerned with:
>
> (1) the conduct of a judge acting in an official capacity
> (2) any other conduct which affects the judge while acting in an official capacity, and
> (3) conduct prohibited by law.

23

"To read into the constitution or the canons prohibitions which go beyond the above categories is to enter a most precarious area of inquiry for the state—the realm in which private moral beliefs are enforced and private notions of acceptable social conduct are treated as law. Standards in these private areas are constantly evolving and escape, at any given moment, precise definition. Conduct of a judge or any public official which may be offensive to the personal sensitivities of a segment of the society is properly judged in the privacy of the ballot box. . . .

"Thus, it can be seen that there are, in effect, two tribunals wherein judgments must be made concerning the conduct of a judge. For some matters that tribunal is properly the people through the ballot box. This Court as the other tribunal can only be concerned with conduct which as previously noted involves a judge acting in his official capacity or conduct which affects the judge acting in an official capacity or conduct prohibited by law." *Matter of Dalessandro*, 483 Pa. 431, 460-61, 397 A.2d 743 (1979).

And there is yet a third tribunal of judgment on the conduct of judges—the legislative tribunal of a court of impeachment. Kan. Const. art. 2, §§ 27-28. While not an impeachment proceeding, our Legislature has recently demonstrated its willingness and ability to condemn the character and integrity of a judicial nominee when the Kansas Senate rejected one such nominee by a vote of 38-0. See Carpenter, *Senate Unanimously Rejects Jack*, The Topeka Capital-Journal (May 14, 2019), https://www.cjonline.com/story/news/politics/state/2019/05/14/kansas-senate-rejects-twitter-damaged-nominee-for-court-of-appeals/5162383007/.

Nothing in my opinion today should be read to conclude that I think Judge Clark should have remained a judge. My judgment is more limited—if a public official is to be removed from office or otherwise sanctioned for lawful private conduct unrelated to the performance of his or her public duties, that sanction must be procured through political means. It is not our role to decide for the public what counts as sufficiently acceptable character for the job.

24

We are all sinners. Acknowledging this truth is one of the pillars supporting the rule of law itself. See The Federalist No. 37 (James Madison) ("The history of almost all the great councils and consultations held among mankind for reconciling their discordant opinions, assuaging their mutual jealousies, and adjusting their respective interests, is a history of factions, contentions, and disappointments, and may be classed among the most dark and degrading pictures which display the infirmities and depravities of the human character."); The Federalist No. 55 (Alexander Hamilton or James Madison) ("[T]here is a degree of depravity in mankind which requires a certain degree of circumspection and distrust."); see also Calabresi, *Render Unto Caesar That Which Is Caesar's, and Unto God That Which Is God's*, 31 Harv. J.L. & Pub. Pol'y 495, 499 (2008) ("History has clearly proven Madison right about the fallenness of human nature, and Christian Utopians, Rousseau, and Marx tragically wrong. . . . There is no escaping the Fall . . . and government leaders are fallen, corruptible individuals.").

Judges are not "angels"—to put it in Madisonian terms. See The Federalist No. 51 (Alexander Hamilton or James Madison) ("If men were angels, no government would be necessary."). And the purpose of the Code of Judicial Conduct is not to protect or project an illusion of judges as angelic demigods or Mosaic lawgivers. It is quite the opposite— to guard against the very real danger of judges as ordinary human beings tempted to abuse their power in vain and self-interested ways. The Code protects very practically against official and public misdeeds—it is not concerned with preserving judicial authority grounded in moral superiority. To the contrary, the legitimate exercise of judicial authority flows from the people acting under a constitutional process, not from any innate moral qualities possessed by the judge.

In this country, none are born or entitled to rule due to any real or imagined superiority. To suppose otherwise is to sow the seeds of passivity and apathy on the one

hand (a people not given to the virtue of self-government because it is not expected of them)—and cynicism and disillusionment (when the lie is inevitably exposed), on the other. For indeed, no judge held to that standard could withstand public scrutiny, ridicule, embarrassment, and condemnation if the fullness of our private lives were broadcast to all. One's imagination need not run immediately to the salacious or sexual. One merely has to imagine a judge as an exasperated parent. Or a judge who handles an argument with a spouse poorly. Or a judge who tells an off-color joke.

I am reminded, at last, of scorned and humiliated Hester Prynne—pondering the "hidden sin" in every human heart, musing over the fact that "if truth were everywhere to be shown, a scarlet letter would blaze forth on many a bosom." Hawthorne, The Scarlet Letter 72 (George Stade ed., Barnes and Noble Books 2003) (1850). The lesson Hawthorne's classic teaches is not, as is sometimes supposed, an ethic of sexual liberation. Rather, it is that human society tends toward moral stratification as it ever and always resists the natural democratization and equality that comes from an acknowledgment of universal failure.

"There is none righteous, no, not one." Romans 3:10 (King James Version). Absent this kind of fundamental equality before the law, systems of accusation and punishment are too often motivated by "the narcissistic satisfaction" the powerful will take in "being able to think [themselves] better than others"—rather than from legitimate and just efforts to protect and provide for the common good of society. Freud, Civilization and Its Discontents 109 (James Strachey ed. and trans., W. W. Norton & Co. 1961). Under the rule of law, when and how failures legitimately subject a person to public sanction is perhaps the most important question of public justice. In the narrow category of the lawful private acts of public officials unrelated to their public duties, the remedy must be political. Otherwise, the very will of the public may be thwarted by a

government purporting to act on the public's behalf—but in truth, acting only to elevate and insulate itself.

Given all of this, I concur in judgment because I find no violation of the judicial codes of conduct. Of course, no one should read in this conclusion a defense of judges-gone-wild or of any other misdeed or lapse in character. After all, "go, and sin no more" (John 8:3-11) remains an apt and fitting conclusion to every story like this one.

WALL, J., joins the foregoing concurrence.